**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **HY-KO PRODUCTS COMPANY LLC, a** | ) | |
| **Michigan company,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **C.A. No. 2:21-cv-00197-JRG** |
| **v.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **THE HILLMAN GROUP, INC., a Delaware** | ) | |
| **company.** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S AMENDED COMPLAINT**

COMES NOW Plaintiff Hy-Ko Products Company LLC ("Plaintiff" or "Hy-Ko") and

asserts claims against Defendant The Hillman Group, Inc. ("Defendant" or "Hillman") and

alleges as follows:

**NATURE OF THE ACTION**

1.      This case is about unlawful conduct by a multi-billion dollar company, Hillman,

to maintain and expand control of the lucrative key duplication business.  This action includes

claims for patent infringement in violation of 35 U.S.C. § 271; false advertising in violation of

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); unlawful conversion of property or

receipt of stolen property; replevin to return the stolen property; and unfair competition – all in

furtherance of controlling the key duplication business.  In addition to other requests for relief,

specified in the Prayer for Relief, Plaintiff seeks, both for itself and for the benefit of the

consuming public, judgment (a) enjoining Hillman from further unlawful acts of false and/or

misleading advertising, (b) requiring remedial advertising, (c) enjoining further patent

infringement, (d) returning stolen property, (e)  awarding monetary damages for willful

violations of law and Hy-Ko's rights, and (f) awarding Hy-Ko its reasonable attorneys' fees and costs of suit.

## THE PARTIES

2.      Hy-Ko Products Company LLC ("Hy-Ko") is a Michigan limited liability company with a principal place of business at 60 Meadow Lane, Northfield, Ohio 44067-1415.

3.      The Hillman Group, Inc. ("Hillman") is a corporation organized and existing under the laws of Delaware with a principal place of business at 10590 Hamilton Avenue, Cincinnati, Ohio 45231.

4.      Hillman is engaged in the business of providing a variety of products and services for the retail industry, with a focus on the hardware and home improvement businesses. Hillman's products include a variety of key duplication machines, including its FastKey, Minute Key, and KeyKrafter key duplication machines.  Hillman deploys its key duplication machines in this judicial district [E.D. Texas] and throughout the United States.

## JURISDICTION AND VENUE

5.      Hy-Ko realleges, and incorporates in full herein, each preceding paragraph.

6.      This action arises under the Lanham Act, 15 U.S.C. §§ 1121 et seq., and the Patent Laws, 35 U.S.C. § 1 et seq., and this Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C.§§ 1331 and 1338(a).  This action also invokes the supplemental jurisdiction of this Court to adjudicate the state law claims under 28 U.S.C. §1367(a).

7.      This Court has personal jurisdiction over Hillman because, on information and belief, Hillman purposely avails itself of the privilege of doing business in Texas and/or derives substantial revenue from goods and services provided to individuals in Texas, including via the deployment of key duplication machines.

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and/or §1400(b) because on information and belief, Hillman has committed acts of patent infringement within the Eastern District of Texas.  In addition, Hillman has multiple regular and established places of business in this district, including several buildings and numerous key duplication machines.

9.     More than one hundred Hillman automatic key duplication machines including FastKey, Minute Key, and KeyKrafter key duplication machines are deployed in the Eastern District of Texas.  On information and belief, Hillman owns each of these machines, deploys them into service under agreements with retailers that compensate Hillman, tests each of the machines, and maintains and services each machine during their period of deployment to assure that they are operational and can be used for their intended purpose of key duplication.

10.     On information and belief, Hillman introduced the KeyKrafter and PKOR (the "Accused Products") into interstate commerce and has marketed these Accused Products to various retailers throughout the United States and this District, including but not limited to Walmart, The Home Depot, Lowe's, and ACE.

11.     On information and belief, the Accused Products found in this District are owned by Hillman.

12.     Hillman also maintains three manufacturing and distribution facilities located in this District, totaling more than 334,000 square feet of commercial real estate.

13.     Hillman operates a 165,705 square foot distribution facility at 514 Bennett Lane, Lewisville, Texas, located within this District.  Hillman employs approximately 110 people at the Lewisville facility, which is Hillman's only U.S. distribution center located between Arizona and Ohio.

14.     Hillman has leased the Lewisville facility since December of 2017, and has a valid lease on the property through at least May of 2025.  On information and belief, more than two million products relating to Hillman's key duplication business touched the Lewisville facility in the twelve months ending in August 2019, representing tens of millions of dollars in eventual sales.

15.     Hillman additionally maintains two facilities in Tyler, Texas, also located in this District.  Hillman operates a 105,259 square foot manufacturing, storage, and distribution facility located at 2329 East Commerce Street, Tyler, Texas 75702, and a 63,000 square foot office, manufacturing, storage, and distribution facility located at 6357 Reynolds Road, Tyler, Texas 75708.  Hillman has operated the two Tyler facilities since November of 2017, and has a valid lease on each property through at least November 2022, with options to renew for at least ten additional years.  Hillman employs approximately 180 people combined at its two Tyler facilities.

## BACKGROUND OF THE CASE

### The Key Duplication Business

16.     Thousands of home, auto and other keys are duplicated each day to replace lost keys or to share extra keys with family or friends.  Consumers in need of duplicate keys usually chose familiar retail venues with automated machines rather than a professional locksmith.  Even with locksmiths excluded from the count, key duplication across the U.S. generates over $600 million per year at the retail level alone.

17.     Just three companies in the U.S. today are significant vendors of automated key duplication machines suitable for general retail environments – Hillman, Hy-Ko, and KeyMe.  These companies serve the needs of customers at two levels.  The first level consists of brick-and-mortar retailers that host the key duplication equipment and purchase uncut key "blanks"

and key accessories.  The second level consists of the individual consumers who purchase the thousands of duplicate keys cut from those key blanks each day with that hosted equipment, and key accessories.

18.     At the retail merchant level, key duplication is a complex business because hundreds of uncut key blank styles and types must be kept on-hand to promptly create a duplicate made from the correct key blank when the consumer needs one and the automated equipment must be able to process that wide variety of key blanks. Automotive keys increase the complexity because many of them use electronic security features recorded in the key's "head," as discussed below.

19.     At the consumer level, a customer often has little time or incentive for distant travel and price-shopping for a duplicate key.  Also, no substitute exists for a reliable and accurate duplicate key.  For these reasons, the level of demand among consumers is relatively insensitive to price increases.  In economic terms, it is known as a relatively inelastic retail market.

20.     The combination of complexity and inelasticity makes the key duplication business a potentially lucrative business to control.  The retail level complexity means that barriers to entry exist for competing key duplication systems.  The inelasticity at the consumer level means small price increases can be passed through to the consumer and can produce large nationwide profits for the vendor.

21.     Keys have been duplicated manually for decades on manual "key duplicators" – hand-operated mechanical tracer machines used by experienced hardware-store associates or by professional locksmiths who used line-of-sight comparison to select the correct key blank to cut from among dozens of choices.  These machine operators perfected their hand-working skills through practice and are readily accountable to the nearby consumer if the duplicate key fails in

their home or car.  That situation began to change when retail and supply chains began

consolidating towards national Big Box chains (e.g., Lowe's, Home Depot, Menards, Walmart,

etc.); regional chains (e.g., Orchard Supply, etc.); and nationwide co-operatives (e.g. ACE,

TruValue, etc.) (collectively "Big Box and Co-op").

### Hillman Acquired a Dominant Position in Retail-Friendly Key Duplication in 2000

22.     The market change mentioned above resulted in higher employee turnover, and

lack of store associate training in work such as key cutting.  It also resulted in lower staffing

levels, and pressure for operational efficiencies and minimum size footprint of equipment and

supplies.  These factors prevented Big Box retailers in particular from using the hand-operated

machines and visual selection of key blanks for duplication.  They needed a more versatile

automated key duplication solution that was suitable for the retail environment.  Axxess

Technologies, Inc. ("Axxess Technologies") was one of the first firms to invent a solution to this

problem, specifically the Axxess key duplication system (the "Axxess system") for which

Axxess Technologies in 1992 applied for and obtained U.S. Patent No. 5,351,409.  Among other

things, this system features mechanical key identifier panels to help a store associate chose the

correct key blank, and a pre-configured key cutting assembly using cassettes to cut a new

duplicate key.

23.     The Axxess system was found to be an improvement in the new market

environment over hand-operated tracer machines and pure visual comparison for key blank

selection.  In the early 2000s, the Axxess system had no competition in that market other than the

old hand-operated tracer machines.

24.     Under the Axxess Technologies business model, each Axxess system typically

remained owned by Axxess Technologies but hosted under contract to each retail store location.

A profit typically was earned by Axxess through the price Axxess Technologies charged to the

retailer for supplying the uncut key blanks.  In that way, Axxess Technologies and the retail merchant would share the profit earned from each consumer purchase of a duplicate key.  Axxess Technologies commercialized its system around 1990 and had built and deployed around 10,000 units around the country ten years later in 2000.

25.      In the year 2000, Hillman was a dominant supplier of fasteners in the Big Box and Co-op chains and elsewhere. Hillman's fastener business had and continues to have substantial competitive barriers because it is capital intensive and involves thousands of SKUs and hundreds of Hillman service representatives to visit retailers and manage the inventory.

26.      Hillman took an interest in the installed base of Axxess systems positioned in retail stores near Hillman's fasteners.  Accordingly, Hillman acquired Axxess Technologies by merger in 2000 for a reported $110 million in cash and stocks and an unreported amount of the debt that Axxess Technologies had accumulated, in part, from deploying the 10,000 machines that Axxess Technologies continued to own.

27.      Hillman described its Axxess acquisition in an SEC filing as follows:

> Hillman believes that it is the leading provider of fasteners and related small hardware items, including keys and related accessories and identification items, such as, tags, and letters, numbers and signs ("LNS") to retail outlets in North America.
>
> ***
>
> On April 7, 2000, the Company acquired Axxess Technologies, Inc. ("Axxess" or "Axxess Technologies") of Tempe, Arizona through a stock merger transaction.  Axxess is a manufacturer and distributor of key duplication and identification systems.
>
> ***
>
> The patent-protected Axxess Precision Key Duplication System(TM) revolutionized the metal key duplication process, *allowing key duplication to be transformed into a highly profitable revenue source within Big Box retailers* (defined as mass merchants, home centers and large-format grocery/drug centers). This system has been placed in over 10,000 retail locations to date (emphasis added).

*\*\**

The Axxess Precision Key Duplication System(TM) creates high quality duplicate keys with the precision of a locksmith while minimizing the technical skill required by operators. The system was developed in response to retailers['] needs for reducing the miscut rate on keys. Axxess keys provide retailers with *nearly **ten times** more gross profit **per square foot** than the average of all products sold in grocery and mass merchant channels*… (emphasis added).

*\*\**

The total domestic market for keys [in 2000] is estimated to be 600 million units at the retail level with annual sales of over $900 million. The key duplication market can be segmented into three primary retail categories: hardware stores, locksmiths and Big Box retailers. *Hillman maintains the leading market position* with an approximate 28% market share on a unit basis in the overall key duplication market, including ***an estimated 67% market sha****re in the home center/mass merchant retail segment*. To displace the Hillman Group's market position, a competitor would have to develop a full range of products with demonstrably better technology without infringing on patents and buyback existing [key blank] inventory from retailers. *Management believes that these substantial competitive barriers help preserve its unique franchise within the key duplication market segment* (emphasis added).

28. Hillman ownership, directors, officers, and management clearly understood the value of its retail key business dominance. Hillman continued to expand store locations where Axxess systems were placed. Seven years later in 2007, Hillman reported: "The patent-protected Axxess Precision Key Duplication System™ has proven to be a profitable revenue source within Big Box retailers. … This system has been placed in over 15,200 retail locations to date…."

29. Hillman also enhanced its market control under a supply contract with the dominant U.S. key blank producer, Kaba Ilco Corp. ("Ilco"). By the mid-2000s, Hillman was the frontrunner and dominant key duplication machine vendor in a highly concentrated market.

30. Before Hy-Ko's inventions, Big Box chains that wanted the revenue and foot traffic provided by the key duplication business had no retail-friendly alternative to the Hillman Axxess System. Hillman's market control was extended even further, on information and belief,

by its market share with fasteners, a business that Hillman also has dominated for years and dominates to this day.

### Hillman Milks its Axxess "Cash Cow" to the Disadvantage of Customers and Consumers

31.     Hillman's dominance in the key duplication business, coupled with its dominance in the fastener business, has afforded and still affords Hillman significant control over those products in the Big Box and Co-op channels.

32.     While Hillman's Axxess system was an improvement over hand-operated manual key duplicators, it still had problems that frustrated the retail store associates and consumers alike.  The Axxess system was known to produce "miscuts" that would not work properly in the consumer's lock at a higher rate than was typically experienced with a well-trained hardware store associate using hand-operated key cutting tracer machines.    The Axxess system could be complicated for unskilled staff, could cause human error, and could include mechanical tolerance inaccuracies, and other difficulties.  The Big Box and Co-op management, store associates and consumers suffered the consequences.

33.     Hillman had little incentive in the early or mid-2000s to invest in and deploy new technology that would replace the aging Axxess machines.  After all, by 2007 Hillman had an installed base of over 15,000 Axxess machines that it continued to own and would be very expensive to replace.  Hillman was in no hurry to upgrade its retailers from the aging Axxess systems invented more than 15 years earlier.

### Hillman's Dominance of the Replacement Key Business at Retail Comes under Threat

34.     Hy-Ko's invention history has its roots in Hillman's Axxess system dominance. Hy-Ko was Hillman's top competitor as a vendor of numbers, letters and signs in the Big Box and Co-op channels and elsewhere.  Hy-Ko began its innovations in the key duplication business

in the early 2000s because its customers were encouraging Hy-Ko to create a better solution than the Hillman Axxess system.

35.     One of Hy-Ko's early innovations was a key blank identification system that enabled store associates to more quickly select the correct key blank for cutting a replacement key.  Hy-Ko sought and obtained patent protection for this innovation.  Hy-Ko also developed a complete UPC-coded key program to modernize supply chains.  Hy-Ko's was the first to barcode all keys and Hillman followed suit a few years later.

36.     Hy-Ko developed relationships with customers relating to keys, key accessories, and key cutting machines.  For instance, Hy-Ko began to supply The Home Depot with key blanks and a new key duplicator it developed.  In addition, Hy-Ko also became an independent source of key blanks to ACE, and a supplier to Walmart of key accessories.  Hy-Ko repeatedly heard from customers at the stores that they were frustrated with their old Axxess systems.

37.     At the time of Hy-Ko's inventions disclosed in the Asserted Patents, there was a long-felt need for an accurate and versatile automatic key duplication system suitable for use in the retail environment.  Hillman had failed to achieve such an invention.

38.     A major opportunity for Hy-Ko occurred with Walmart.  Walmart had been hosting Hillman's Axxess systems in store automotive departments.  Walmart asked for Hy-Ko's help to modernize its key business.  Hy-Ko agreed to create a better solution.  Walmart committed to offering Hy-Ko a significant portion of its key business and store locations if Hy-Ko were to design an automated key duplication machine that was easier to use and more accurate at cutting keys than the aging Axxess system.

39.     Hy-Ko embarked on a long and very expensive and intensive research and development effort over a period of years.  The effort culminated in what became known as Hy-Ko's Key Identification and Duplication or KID system (hereafter "KID System"), which has

been awarded 20 issued and active U.S. Patents.  Hy-Ko's inventions disclosed in the Asserted

Patents also had the unexpected result of better key blank selection by ignoring the key head and

better accommodation of automotive keys with thick key heads and other variations that later

came on the market.

40.     When Hy-Ko showed the first design of the KID System to Walmart personnel,

Walmart promptly ordered 100 KID System units to be deployed in field tests as soon as they

could be built.  Walmart reaffirmed its commitment that more orders would come if the field test

was successful, which it was.  Walmart also informed Hy-Ko of its commitment to having two

suppliers for its key duplication business rather than be dependent solely on Hillman.

41.     Hy-Ko also developed a second generation of the KID System.  One important

new feature was the ability to "clone" automotive "transponder" keys using an electronic tool

that Hy-Ko branded the "I-Tool."  This cloning component enabled the KID System to duplicate

electronic automotive keys.  Walmart was excited and hailed it as a significant competitive

advantage.

42.     In the time frame 2007-2009, Hillman lacked an accurate, versatile automatic key

duplication system suitable for use in the retail environment with key cloning capability.

Hillman had failed to achieve such an invention.

43.     Automotive transponder keys use an identification code stored on a micro-chip

built into the key. That code is necessary to start the engine.  Automotive transponder keys

command higher prices at retail because the alternative is to have an automotive locksmith, or

alternatively an auto dealership, plug a programming tool into the vehicle dashboard to

reprogram the car's computer.  This alternative process is commonly known as the "OBD"

programming process for the "on board diagnostics" port under the dashboard, which is

discussed more below.

44.     The KID System's cloning technology accomplishes much faster and simpler key duplication at retail than the OBD process.  Cloning can be done inside the store in minutes without access to the vehicle, while the OBD process requires the vehicle to be present and parked where someone can reach under the dashboard to perform a programming sequence.

45.     Retailers throughout North America installed KID systems including AutoZone, Orchard Supply Hardware, Walmart, Home Depot, ACE, Canadian Tire, and Home Depot-Mexico.  It created a new competitive threat to Hillman's large installed and paid-for base of over 15,000 Axxess systems and, more broadly, its key business at Walmart and other retailers.

46.     The KID system is an embodiment of Hy-Ko's inventions disclosed in the Asserted Patents and achieved commercial success.  Hy-Ko's inventions disclosed in the Asserted Patents also received retail industry recognition among buyers and trade media recognition.

### Hillman Responds with Pressure and Customer Meddling

47.     On information and belief, by mid-2007, Hillman had seen the KID System and recognized its technological advancement in the retail key duplication business.  At that time, Hillman had not yet commercialized a comparable product that solved the problems associated with the old Axxess machine.

48.     Hillman made no attempt to negotiate a license with Hy-Ko to use Hy-Ko's hard-earned KID system innovations.  Instead, Hillman sued Hy-Ko and initiated a campaign directed at retailers including Walmart to stop doing business with Hy-Ko.  Hillman needed time to try to catch up with Hy-Ko's technology.  Walmart suspended its rollout of KID Systems across the U.S., apparently influenced by Hillman to do so.

49.     Hy-Ko eventually responded to the litigation with an antitrust lawsuit against Hillman and Ilco, the former's exclusive supplier of key blanks and transponder keys, for

monopolization and unlawful restraint of trade under the Sherman Act.  *Hy-Ko Products, Inc. v. The Hillman Group, Inc*, 5:10-cv-00992-DDD (N.D. Ohio).  Hy-Ko alleged that Hillman responded to the threat posed by the KID System by engaging in a campaign of exclusionary, predatory, deceitful, disparaging and coercive practices designed to protect its Axxess installed base, hamper competition from the KID System, and cut off Hy-Ko's revenue sources associated with the key business and beyond.

50.     The case showed the extremes of Hillman's business practices to protect its key business dominance.  The public record alleges that Hillman's deceit included at least one instance of a Hillman representative posing as an employee of Hy-Ko to gain access to a KID system installed in a Walmart store to inspect the system.

51.     The patent and antitrust cases eventually settled in late 2012, shortly before trial. During the course of these proceedings, Hillman representatives learned about Hy-Ko's business and its technology related to its KID System.  Hillman was given access to details about Hy-Ko's long-standing relationship with ACE and the importance of that relationship to Hy-Ko's financial well-being.

52.     At no point, however, did Hillman propose to pay Hy-Ko to license the use of Hy-Ko's hard-earned innovations and technology advances.  At an ACE convention, a Hillman executive openly disclosed to Hy-Ko personnel his employer's plan to "one day take over the ACE business."

## Hillman Involvement in the Misappropriation of Hy-Ko KID System Engineering Drawings

53.     From the start, Hy-Ko's KID Systems were individually numbered and each one had a securely attached label showing ownership by Hy-Ko or affiliate.  The label also stated:

"Patent Listing at www.hy-ko.com/patents."  That patent listing was regularly updated as new patents were granted.

54.     Hy-Ko has come to learn, on information and belief, that Hillman has demonstrated to others that Hillman possessed  detailed technical information regarding Hy-Ko's key systems, including  a  stack of detailed Hy-Ko engineering drawings for Hy-Ko's KID system.  On information and belief, Hillman  obtained these engineering drawings through unlawful means while knowing that Hy-Ko considers the drawings to be highly confidential.

55.     Despite meetings and encounters between the companies' management, Hillman never disclosed to Hy-Ko that Hillman had and has  detailed engineering drawings for the KID system.  On information and belief, the misappropriated detailed engineering drawings for Hy-Ko's KID system remain in Hillman's possession.

56.     In 2016, Hillman launched a key duplication machine called the "KeyKrafter" that Hillman proclaims is "state of the art."  The KeyKrafter, however, is a by-product of Hillman's reverse engineering effort, copying many of Hy-Ko's KID machine's features.

57.     Hy-Ko inventions disclosed and claimed in at least some of the claims of the Asserted Patents were copied by its competitor, Hillman.

58.     Hillman's technology "advancements" were based in part on Hy-Ko's research and development efforts, without attribution, compensation, or even a request for a license.  On multiple occasions, a Hillman executive acknowledged to Hy-Ko personnel at trade shows that Hy-Ko's innovations in key duplication spurred Hillman to modernize its key duplication technology.

**Hillman's False and/or Misleading Statements to**

-14-

## Hy-Ko Customers and other Unfair Competition

59.     Aside from copying Hy-Ko's technology, Hillman eventually made good on its threat to take away Hy-Ko's critical ACE business, too.  It did so via a purposeful disparagement campaign filled with false and/or misleading statements about Hy-Ko's key duplication technology solutions, resulting in severe damage to Hy-Ko's business.

60.     To understand the damage caused by Hillman's trade disparagement campaign, it is important to understand how retail chains purchase products from vendors.  Big Box chains routinely operate through centralized purchasing management.  Big Box management periodically conduct an invitation-only competition called a "line review" to choose vendors. This allows for private presentations and discussions with the Big Box buyer.  On information and belief, Hillman typically secures long-term exclusive contracts with its Big Box customers to be the exclusive key duplication vendor for most store locations across the country and for a minimum duration typically measured in years.

61.     In contrast, at co-ops like ACE, each store is privately owned by a co-op member that pays dues and receives a yearly distribution similar to a stock dividend from the co-op's central organizers and representatives ("the ACE HQ").  Hillman SEC filings group these into a category that it calls "Franchise and Independents" ("F&I").  ACE HQ personnel manage advertising and the nationwide distribution network that delivers products offered to co-op members (each an "ACE Dealer").  The ultimate decision for each store's product offerings remains with the ACE Dealer who typically owns the store.  The influence of ACE HQ representatives, and the decisions by ACE HQ staff about which products to maintain in the distribution network, each has an important and financial influence on an individual ACE Dealer's choices.

62.     Hillman spotted an opportunity to pry the ACE key duplication business away from Hy-Ko when ACE HQ management began a line review of the key duplication business. Throughout the line review, and later at the ACE Dealer level, Hillman and Hy-Ko were and remain in head-to-head competition across the country for the key duplication business at local ACE Dealers.

63.     To prevail with ACE HQ, Hillman conducted a trade disparagement campaign in interstate commerce that included literally false and/or misleading statements about the capabilities of Hy-Ko's automotive-key cloning technology.  Hillman's trade disparagement was first aimed at ACE HQ personnel in the line review, and later the individual ACE Dealers.  The disparagement consisted of materially misrepresenting the percentage of well-known popular vehicle keys that could be duplicated with Hy-Ko's key cloning program – at that point in time and in the future.  The false disparagement campaign was intentional. It had a significant impact on decision-making by ACE HQ personnel and ACE Dealers regarding their key duplication businesses.  As a result, some ACE HQ personnel became unwitting conduits for repeating the disparagement to the ACE Dealer network.  Hillman knew or should have known that ACE HQ personnel had no practical ability to independently assess the truth or accuracy of Hillman's false statements.

64.     Hy-Ko tried to counter and cure these misrepresentations through self-help measures.  Among other things, Hy-Ko contacted the ACE HQ executive team regarding the false and/or misleading statements, to little or no avail.  And Hy-Ko contacted ACE Dealers about Hillman's misinformation campaign, likewise with limited effect.

65.     Hillman's product disparagement campaign eventually had its intended effect: Hy-Ko lost the ACE HQ key business to Hillman.  It also gradually had nearly the same effect at the ACE Dealer level.  While Hy-Ko managed to retain some ACE Dealers despite Hillman's

trade disparagement, Hillman has unjustly gained the majority of them through both its false

product disparagement and its control over the ACE HQ distribution center network that supplies

the ACE Dealers.

### Hillman's False and/or Misleading Trade Disparagement Campaign

66.     The following paragraphs detail some of the false and/or misleading statements

that Hillman published and distributed in interstate commerce, intending to cause ACE HQ and

ACE Dealers to end their key business relationship with Hy-Ko.  As one example, Hillman

published and distributed the false and/or misleading statement that "Vehicles Manufactured

with a 'Cloneable' Chip" in model year 2017 was limited to "Less than **1%**"(emphasis added).

This statement is literally false and/or misleading.  Hy-Ko objected to such false and/or

misleading statements to ACE HQ and Dealers, but they had their intended effect of damaging

Hy-Ko's business and continue to do so.  Hillman made this false and/or misleading statement

with or to ACE HQ personnel and to ACE Dealers from around the country during line review

meetings and trade shows and other channels.

67.     Hillman also published and distributed the false and/or misleading statement that

the number of "Vehicles Manufactures with a 'Cloneable' Chip" in model year 2014 was limited

to "**21%**". (emphasis added).  This statement is literally false and/or misleading.   Hillman made

this false and/or misleading statement with or to ACE HQ personnel and to ACE Dealers from

around the country during line review meetings and trade shows and other channels.

68.     Hillman also published and distributed the false and/or misleading statement in a

hand-out brochure stating, "Remember, **cloning only serves cars up to model year 2012!**"

(emphasis added).  Hillman spread this false and/or misleading statement, claiming a model year

2012 cutoff date for Hy-Ko's cloning technology, throughout the tradeshow crowd of ACE

Dealers.  Although Hy-Ko objected to the false statements, they had their intended effect of

damaging Hy-Ko's business and continue to do so.  Hillman perpetrated the false statement with or to ACE HQ personnel and to ACE Dealers from around the country during line review meetings and trade shows and other channels.

69.     Hillman also published and distributed the false and/or misleading statement in a booth display which stated that "The Toyota Camry has been one of the highest selling vehicles on the road for many years…," and presented a graphic display claiming that cloning of Toyota Camry keys ended with model year 2011.  This statement is literally false and/or misleading. Hillman again made this false and/or misleading statement with or to ACE HQ personnel and to ACE Dealers from around the country during line review meetings and trade shows and other channels.

70.     Hillman also published and distributed the false and/or misleading statement that "Cloning takes care of keys **up until 2012** and **covers only 44% of registered vehicles on the road**" (emphasis added).  This statement was literally false and/or misleading.  Despite Hy-Ko's objections to this false and/or misleading statement, it had the intended effect of damaging Hy-Ko's business and continues to do so.  Hillman made this false statement to the ACE community via an AceNet posting.

71.     Hillman also published and distributed the false and/or misleading statement that "**less than 1%** of vehicles produced **from 2016 and beyond** have a cloneable key/remote" (emphasis added).  This statement is literally false and/or misleading.  Hillman perpetrated the statement to ACE Dealers in advertising and promotional materials.

72.     Hillman also published and distributed false and/or misleading statements to ACE Dealers in commercial advertising and promotion regarding Hy-Ko, including falsely stating that Hy-Ko was going out of business and would no longer continue to support its key duplication business.  Made in interstate commerce, like its other false and/or misleading statements

referenced above, these statements were known by Hillman to be false or, at the very least, were made by Hillman in reckless disregard for their truth. In addition, the statements were material and made in bad faith for at least the reason that they were likely to influence the purchasing decisions of a substantial portion of Hy-Ko's customer base (and potential customers) and, on information and belief, calculated to and did mislead and deceive ACE Dealers around the country and cause them not to do business with Hy-Ko.

73.     Hillman's product disparagement campaign and other false and/misleading statements about Hy-Ko "going out of business," or ending its key duplication programs, resulted in severe harm to Hy-Ko.  At the time that ACE HQ began its line review of the key duplication business, Hy-Ko was a Platinum-ranked vendor at ACE.  As a result of Hillman's false and/or misleading statements through advertising and/or promotion about the nature, characteristics and qualities of Hy-Ko's goods, services and commercial activities, Hy-Ko was damaged just as Hillman intended.  On December 31, 2017, ACE HQ ended its purchases of Hy-Ko mechanical key blanks for the ACE distribution network.

74.     While Hy-Ko managed to retain some individual ACE Dealers using other distribution networks, the majority were lost due to Hillman's unlawful trade disparagement and other unfair competition that continues to this day.   As a direct result of Hillman's false and/or misleading statements, Hy-Ko lost considerable revenue and profits.  Hillman gained considerable additional revenue and profits including at least $12.6M annually in new revenue from ACE.

75.     Hillman also interfered with existing Hy-Ko customer relationships at ACE Dealers and elsewhere.  Just this year, Hillman induced a Hy-Ko customer, Costello's Ace Hardware, to terminate its KID system contract before it reached the end of its term, thereby depriving Hy-Ko of the bargained-for business from this customer.  Hillman had knowledge of

the contract and induced its breach by various improper means causing Costello's to replace Hy-Ko with Hillman as its key duplication vendor.  Hillman also induced Costello's and others to replace Hy-Ko with Hillman through unlawful practices such as financial schemes in exchange for removing Hy-Ko as its competitor.  On information and belief, discovery in this case will reveal similar instances of Hillman unlawfully interfering with Hy-Ko's contracts with customers and of unfairly competing with Hy-Ko using improper business practices with Hy-Ko customers.  Hillman's actions succeeded in suppressing innovation and competition from Hy-Ko.

### Hillman Also Pressures, Then Purchases, Rival "Minute Key" and Learns More about Hy-Ko's Patents in the Process

76.     Around 2008, a small startup named "Minute Key" introduced a self-service key duplication "kiosk" to the retail industry that also threatened Hillman's dominance.  These kiosks enabled consumers to duplicate a limited variety of popular mechanical keys without any assistance.  Minute Key's business model differed from the Hillman Axxess business model in the manner of revenue-sharing with the retailer.

77.     Minute Key had early success with one of Hillman's biggest customers, Lowe's, where Hillman had hundreds of Axxess machines deployed.  The negative financial impact to Hillman from Minute Key's success at Lowe's was significant.  On information and belief, Hillman suffered a 2 million dollar EBITA loss due to Minute Key's success at Lowe's in 2011.

78.     Hillman's CEO at the time noted, in a memo to his staff, that the loss stemmed in part from Hillman's lack of innovation.  In solving the problem of miscut keys, Hillman was "10 years late on this deliverable."  Still, he reassured his staff, the financial loss caused by Minute Key's success at Lowe's would be mitigated by an offsetting price increase that Hillman would demand and aim specifically at Lowe's store locations where Minute Key kiosks were installed. He reminded staff how important the key business is to Hillman.

79.     Eventually, Hillman introduced a self-service kiosk under the name FastKey to combat the Minute Key kiosk "threat." Hillman arranged to place some of its FastKey self-serve kiosks with Walmart by the fall of 2013 for testing against Minute Key. On information and belief, the test results were disappointing.

80.     When Minute Key informed Walmart of Minute Key's patent rights in U.S. Patent No. 8,532,809, Hillman returned to its usual pressure playbook and promptly sued Minute Key seeking a declaratory judgment that it did not infringe the patent and that all claims of the patent were invalid. Hillman's lawsuit also accused Minute Key of interfering with Hillman's contractual relationship with Walmart.

81.     While the lawsuit was underway, Walmart placed both Minute Key and Hillman self-serve kiosks at different Walmart retail outlets for competitive studies. Hoping for a fair competition with Walmart and believing that Walmart's test competition rendered its patent infringement charge valueless (and no doubt advised by its lawyers of the expected high cost to litigate with Hillman), Minute Key instructed its counsel to move to dismiss the case for lack of subject matter jurisdiction after offering complete surrender by: (i) giving Hillman a covenant not to sue for infringement U.S. Patent No. 8,532,809; and (ii) filing a motion to dismiss its counterclaim of patent infringement with prejudice. Nevertheless, Hillman amended its complaint to commence claims of false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a), and the Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.02.

82.     In its Amended Complaint, Hillman alleged that Minute Key "made knowingly false and misleading representations of fact concerning Hillman's FastKey kiosk to mutual customer Walmart to gain a business advantage…. Since the statements were knowingly false, they were likely to deceive their intended audience. This deception was material, as it was specifically crafted to influence Walmart's purchasing decisions in favor of Minute Key and at

the expense of Hillman."  The pleading also alleged that "Minute Key's false and misleading statements were made in bad faith in an attempt to steal business from Hillman" and caused damage to Hillman.  Finally, the pleading alleged that, "[b]y making the false and misleading statements referenced above, and other statements having similar import and effect, Minute Key has disparaged the goods, services, and/or business of Hillman…." Ironically, Hillman has engaged in the same type of unlawful activities aimed at harming Hy-Ko, as described above, that it condemned in its lawsuit against Minute Key.

83.     The case also revealed more about the extremes of Hillman's business practices to protect its key business.  The public record from this case reveals that Hillman attempted to influence a Walmart employee involved with the key duplication kiosk business with an enticing future job offer at Hillman headquarters in Cincinnati.

84.     Hillman pressed its claims against Minute Key all the way through trial, while the litigation remained a cloud over the Walmart line review to the detriment of Minute Key and the advantage of Hillman.  The jury returned a verdict in Hillman's favor but, on information and belief, the sum awarded by the jury was a fraction of the legal fees spent on the case by both sides.

85.     Unable to bankrupt or cripple Minute Key, Hillman bought the company for 156 million dollars.  According to Hillman's press release, "[t]he transaction joins together Hillman's full-service key cutting platform with minuteKEY's [sic] self-service key cutting kiosks…."  On information belief, Hillman acquired Minute Key because Minute Key's self-service kiosks outperformed Hillman's FastKey self-service kiosks.  Hillman adopted the Minute Key machine as its preferred self-serve kiosk offering to customers and wrote off millions of dollars in its investment in its own inferior FastKey brand self-serve kiosk business.

-22-

86.     While the above case was in process, Minute Key's president and founder and other Minute Key executives hosted in-person discussions with Hy-Ko about the possibility of cooperation in the key duplication business and technology.  These Minute Key personnel acknowledged that they had been studying and were familiar with Hy-Ko's patent activity.  Following Minute Key's acquisition by Hillman, Minute Key's founder, Mr. Fagundo, joined Hillman and is now Divisional President, Robotics and Digital Solutions at Hillman.

## The Present Day Situation

87.     Hillman's dominance in the highly concentrated key duplication business continues to increase.  Following Hillman's acquisition of Minute Key, (i) only Hy-Ko remains as Hillman's competitor in full-service key duplication systems, and (ii) only KeyMe remains as Hillman's rival in limited-key self-serve kiosks.

88.     In 2019 and 2020, Hillman sued its only remaining self-serve kiosk rival, KeyMe, for patent infringement in this District.  *The Hillman Group, Inc v. KeyMe, LLC*, Case No. 2:19-cv-00209 and Case No. 2:20-cv-00070.  The Court consolidated the cases and held a single trial on Hillman's infringement claims of infringement regarding 18 claims across six patents.  The jury returned a unanimous verdict, finding that KeyMe did not infringe any of the asserted claims and that nine of the 18 asserted claims were invalid.  The Court entered judgment against Hillman and in favor of KeyMe on April 13, 2021.

89.     While KeyMe may have prevailed in the litigation, it has undoubtedly spent millions of dollars defending itself against Hillman and its formidable war chest.  Like Minute Key and Hy-Ko, the litigation with Hillman likely left KeyMe in a weaker financial position to compete with Hillman.

## HILLMAN'S ACCUSED PRODUCTS

90.     Hillman's products for the retail industry include a variety of key duplication machines and systems, including its PKOR and KeyKrafter key duplication machines (the "Accused Products").  Hillman retains ownership of the PKOR and KeyKrafter machines that it puts into service at its retail industry customer locations.  Hillman enters into contractual relationships that obligate the customer to purchase and use Hillman key blanks to create duplicate keys using those machines and systems.  Under these contracts, Hillman has delivered and continues to deliver possession of the PKOR and KeyKrafter machines in exchange for some form of consideration but does not relinquish ownership.

91.     Hillman, or others acting under Hillman's direction and control, have put PKOR and KeyKrafter machines into service at retail industry customer stores throughout the country. At least some of the activities that put PKOR and/or KeyKrafter machines into service also included testing the functionality of the machine.  At least some of those PKOR and KeyKrafter machines include digital communication links to other equipment operated by Hillman.

92.     Hillman, or others acting under Hillman's direction and control, have performed maintenance activities on its PKOR and KeyKrafter machines at retail industry customer store locations throughout the country.  At least some of those maintenance actions have included testing the functionality of the installed machine.

93.     On-screen and/or audible instructions and labels direct the retail store associate on the actions that must be taken for the pre-programmed PKOR and KeyKrafter machines to create an accurate duplicate key.  Without following Hillman's preprogrammed instructions and labels, Hillman's PKOR and KeyKrafter machines do not reliably create accurate duplicate keys.

94.     Hillman benefits when the store associate follows Hillman's instructions and labels and the PKOR or the KeyKrafter machine's pre-programmed controls produce an accurate

duplicate key for purchase by the consumer.  The retail industry customer where the PKOR or the KeyKrafter machine has been put into service also benefits when the store associate follows Hillman's instructions and labels and the PKOR or the KeyKrafter machine's pre-programmed controls produce an accurate duplicate key for purchase by the consumer.

95.     The PKOR and KeyKrafter machines are specially made or specially adapted for key duplication.  Neither the PKOR nor the KeyKrafter machines has substantial uses other than key duplication.

## INFRINGEMENT OF PATENTS

96.     Plaintiff re-alleges and incorporate by reference all of the allegations set forth in the preceding paragraphs.

97.     Hy-Ko Products Company LLC owns U.S. Patent Numbers 9,656,332 ("the '332 Patent"); 9,682,432 ("the '432 Patent"); 9,687,920 ("the '920 Patent"); and 10,421,133 ("the '133 Patent") (together the "Asserted Patents") and other issued patents and patent applications that are published and/or pending covering key duplication technology.  The '332 Patent is attached as Exhibit A, the '432 Patent is attached as Exhibit B, the '920 Patent is attached as Exhibit C, and the '133 Patent is attached as Exhibit D.

98.     The '332 Patent application was first published as US 2016/037550O2 A1 on December 29, 2016, and most of the original published claims issued unamended on May 23, 2017 as the '332 Patent.  The '432 Patent application was first published as US 2016/0375504 A1 on December 29, 2016, and most of the original published claims issued unamended on June 20, 2017 as the '432 Patent.  The '920 Patent application was first published as US 2016/0375501 Al on December 29, 2016, and most of the original published claims issued unamended on June 27, 2017 as the '920 Patent.  The '133 Patent issued on September 24, 2019. The '214 Patent issued on November 19, 2019.

99.     Hy-Ko has marked its KID machine with the above patents in accordance with 35 U.S.C. § 287.  From the start, Hy-Ko individually numbered and labeled its KID machines to indicate ownership by Hy-Ko or by its subsidiary or affiliate.  The label also stated: "Patent Listing at www.hy-ko.com/patents"; Hy-Ko regularly updated its online identification of applicable patents.

100.     Hillman has received extensive information about Hy-Ko, including details about the extent and importance of Hy-Ko's patents.  For example, Hillman received a December 2017, memorandum that highlighted Hy-Ko's "unparalleled suite of IP."  One entire page bears the heading, "Unparalleled Portfolio of High Value IP."  This page provides details about Hy-Ko's patents, including a press release that received media coverage about Hy-Ko's "Innovation in Key Duplication Technologies."  These items specifically identified the '332 Patent, the '432 Patent and the '920 Patent at issue in this case.  As another example, Hillman received a November 2019 memorandum that discussed Hy-Ko's "world class key duplication technologies."  Hillman never even discussed licensing any patents from Hy-Ko.

## CLAIMS FOR RELIEF

### COUNT I – INFRINGEMENT OF U.S. PATENT NO. 9,656,332

101.     Plaintiff re-alleges and incorporates by reference all of the allegations set forth in the paragraphs 1 through 100.

102.     Hillman, alone or through or in combination with its agents and/or intermediaries or customers, infringes at least one claim of the '332 Patent either literally or through the doctrine of equivalents, by manufacturing, using, offering to sell, selling, and/or providing products and/or services that infringe the '332 patent in the United States, including the "Accused Products" as identified in Exhibits E and F.  Further details of Hillman's infringement are known only to Hillman and will be the subject of discovery.

103.    Among other things, Hillman or persons under its direction and control have used and continue to use the claimed inventions through the testing, operation, service and maintenance of Hillman's Accused Products and services provided to the retail industry for key duplication.  For each claim of the '332 Patent, each and every element recited in that claim contributes to the creation of an accurate duplicate key.  Both Hillman and its retail industry customer benefit from the creation of an accurate duplicate key through the use of the claim's recited elements.  Hillman alone, or indirectly through the instruction, direction, and control of its customer's actions with the PKOR and KeyKrafter machines has used and continues to use the claimed inventions to produce duplicate keys.  Hillman has infringed, is infringing, and will infringe at least claims 1, 2, 4, 8, 9, 10, 11, and 13 of the '332 patent, either literally or under the doctrine of equivalents, and is in violation of 35 U.S.C. § 271(a).

104.    Alternatively, Hillman's actions of delivering possession of its PKOR and KeyKrafter machines and entering into contractual arrangements with its customers to supply keys for processing in those machines formed a joint enterprise under patent law.  On information and belief, Hillman owes its customers written or verbal contractual indemnity obligations for any patent related claims related to or arising out of the use of PKOR and KeyKrafter machines.  By operation of the law of joint enterprise, Hillman is jointly and severally liable to Hy-Ko for infringement by operation and use of the PKOR and KeyKrafter at the customer location pursuant to such joint enterprise and is liable in violation of 35 U.S.C. § 271(a).

105.    Hillman has actively induced, is inducing, and will induce the direct infringement of at least one claim of the '332 patent by its retail customers and by consumers.  On information and belief, Hillman provides instructions to its customers and consumers about how to use the Accused Products and perform each of the steps of the claimed methods.  Hillman provides such

instructions during initial installation and through its periodic training of customers' new sales associates.  Hillman provides training videos that instruct users how to use the machine and to perform each step of the claimed methods, such as the type of instruction videos that Hillman has uploaded to YouTube beginning as early as 2013.  Hillman also provides instruction through its user interface touchscreen mounted on the Accused Products.  Hillman's actions that aid and abet others to infringe include through advertising and marketing the Accused Products and providing instruction materials, training, and services regarding the Accused Products.  On information and belief, Hillman took its actions above with knowledge of the '332 Patent and with the intention to cause the infringing acts of its customers and consumers or willful blindness to same and did so cause the infringing acts to occur.  For example, as mentioned above, Hillman received the 2017 memorandum specifically touting the '332 Patent.  On information and belief, Hillman investigated the '332 Patent to evaluate its potential infringement or deliberately ignored the '332 Patent with willful blindness in disregard of the rights of its much smaller rival, Hy-Ko.  Hillman has accordingly induced, is inducing, and will induce infringement of the '332 patent, either literally or under the doctrine of equivalents, and is liable in violation of 35 U.S.C. § 271(b).

106.     Hillman has contributed, is contributing, and will contribute to the infringement by its customers of at least one claim of the '332 patent. The Accused Products are a material component for use in practicing the Asserted Patents, all of which claim systems, machines and methods for duplicating keys.  The Accused Products are specifically made or adapted for use in an infringement of the Asserted Patents and are not staple articles of commerce suitable for substantial non-infringing use.  For example, Hillman's 2020 Annual Report at page 5 describes the KeyKrafter as Hillman's "most popular, innovative, and effective store associate assisted key duplication kiosk."  Hillman accordingly has contributorily infringed, is infringing, and will

infringe the '332 patent, either literally or under the doctrine of equivalents, and is liable in violation of 35 U.S.C. § 271(c).

107.    As a consequence of each of Hillman's direct and indirect infringement, whether literal and/or under the doctrine of equivalents, of the Asserted Patents, Hy-Ko has been, and continues to be, damaged in an amount not yet determined and is entitled to recover damages pursuant to 35 U.S.C. § 284 and for provisional rights damages under 35 U.S.C. § 154(d).

108.    Upon information and belief, Hillman had actual knowledge of the '332 patent application on or about the publication date of that application.  Upon information and belief, Hillman had actual knowledge of the '332 patent on or about the issue date of May 23, 2017.

109.    Upon information and belief, Hillman had knowledge of the '332 Patent and its infringement thereof, by itself and others, before this case was filed.  Despite this awareness, Hillman continued to use, operate, maintain and service the Accused Products in its retail industry customer locations around the country.  Accordingly, infringement of the '332 patent is willful, and Hy-Ko is entitled to enhanced and other relief.

110.    Upon information and belief, Hillman's infringement of the Asserted Patents will continue in the future, and Hy-Ko will continue to suffer damages as a consequence unless Hillman's infringing acts are enjoined by this Court.

111.    Hy-Ko is entitled to the relief and remedies requested below.

### COUNT II – INFRINGEMENT OF U.S. PATENT NO. 9,682,432

112.    Plaintiff re-alleges and incorporates by reference all of the allegations set forth in the paragraphs 1 through 100.

113.    Hillman, alone or through or in combination with its agents and/or intermediaries or customers, infringes at least one claim of the '432 Patent either literally or through the doctrine of equivalents, by manufacturing, using, offering to sell, selling, and/or providing

products and/or services that infringe the '432 Patent in the United States, including the "Accused Products" as identified in Exhibits G and H.  Further details of Hillman's infringement are known only to Hillman and will be the subject of discovery.

114.    Among other things, Hillman or persons under its direction and control have used and continue to use the claimed inventions through the testing, operation, service and maintenance of Hillman's Accused Products and services provided to the retail industry for key duplication.  For each claim of the '432 Patent, each and every element recited in that claim contributes to the creation of an accurate duplicate key.  Both Hillman and its retail industry customer benefit from the creation of an accurate duplicate key through the use of the claim's recited elements.  Hillman alone, or indirectly through the instruction, direction, and control of its customer's actions with the PKOR and KeyKrafter machines has used and continues to use the claimed inventions to produce duplicate keys.  Hillman has infringed, is infringing, and will infringe at least claim 1, 2, 3, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, 17, 18, 19, 20, 22, 23, 24, 25, 26, and 27 of the '432 Patent, either literally or under the doctrine of equivalents, and is in violation of 35 U.S.C. § 271(a).

115.    Alternatively, Hillman's actions of delivering possession of its PKOR and KeyKrafter machines and entering into contractual arrangements with its customers to supply keys for processing in those machines formed a joint enterprise under patent law.  On information and belief, Hillman owes its customers written or verbal contractual indemnity obligations for any patent related claims related to or arising out of the use of PKOR and KeyKrafter machines.  By operation of the law of joint enterprise, Hillman is jointly and severally liable to Hy-Ko for infringement by operation and use of the PKOR and KeyKrafter at the customer location pursuant to such joint enterprise and is liable in violation of 35 U.S.C. § 271(a).

116.     Hillman has actively induced, is inducing, and will induce the direct infringement of at least one claim of the '432 Patent by its retail customers and by consumers.  On information and belief, Hillman provides instructions to its customers and consumers about how to use the Accused Products and perform each of the steps of the claimed methods.  Hillman provides such instructions during initial installation and through its periodic training of customers' new sales associates.  Hillman provides training videos that instruct users how to use the machine and to perform each step of the claimed methods, such as the type of instruction videos that Hillman has uploaded to YouTube beginning as early as 2013.  Hillman also provides instruction through its user interface touchscreen mounted on the Accused Products.  Hillman's actions that aid and abet others to infringe include through advertising and marketing the Accused Products and providing instruction materials, training, and services regarding the Accused Products.  On information and belief, Hillman took its actions above with knowledge of the '432 Patent and with the intention to cause the infringing acts of its customers and consumers or willful blindness to same and did so cause the infringing acts to occur.  For example, as mentioned above, Hillman received the 2017 memorandum specifically touting the '432 Patent.  On information and belief, Hillman investigated the '432 Patent to evaluate its potential infringement or deliberately ignored the '432 Patent with willful blindness in disregard of the rights of its much smaller rival, Hy-Ko.  Hillman has accordingly induced, is inducing, and will induce infringement of the '432 Patent, either literally or under the doctrine of equivalents, and is liable in violation of 35 U.S.C. § 271(b).

117.     Hillman has contributed, is contributing, and will contribute to the infringement by its customers of at least one claim of the '432 Patent. The Accused Products are a material component for use in practicing the Asserted Patents, all of which claim systems, machines and methods for duplicating keys.  The Accused Products are specifically made or adapted for use in

an infringement of the Asserted Patents and are not staple articles of commerce suitable for substantial non-infringing use.  For example, Hillman's 2020 Annual Report at page 5 describes the KeyKrafter as Hillman's "most popular, innovative, and effective store associate assisted key duplication kiosk."  Hillman accordingly has contributorily infringed, is infringing, and will infringe the '432 Patent, either literally or under the doctrine of equivalents, and is liable in violation of 35 U.S.C. § 271(c).

118.    As a consequence of each of Hillman's direct and indirect infringement, whether literal and/or under the doctrine of equivalents, of the Asserted Patents, Hy-Ko has been, and continues to be, damaged in an amount not yet determined and is entitled to recover damages pursuant to 35 U.S.C. § 284 and for provisional rights damages under 35 U.S.C. § 154(d).

119.    Upon information and belief, Hillman had actual knowledge of the '332 patent application on or about the publication date of that application.  Upon information and belief, Hillman had actual knowledge of the '432 Patent on or about the issue date of May 23, 2017.

120.    Upon information and belief, Hillman had knowledge of the '432 Patent and its infringement thereof, by itself and others, before this case was filed.  Despite this awareness, Hillman continued to use, operate, maintain and service the Accused Products in its retail industry customer locations around the country.  Accordingly, infringement of the '432 Patent is willful, and Hy-Ko is entitled to enhanced and other relief.

121.    Upon information and belief, Hillman's infringement of the Asserted Patents will continue in the future, and Hy-Ko will continue to suffer damages as a consequence unless Hillman's infringing acts are enjoined by this Court.

122.    Hy-Ko is entitled to the relief and remedies requested below.

## COUNT III – INFRINGEMENT OF U.S. PATENT NO. 9,687,920

123.    Plaintiff re-alleges and incorporates by reference all of the allegations set forth in the paragraphs 1 through 100.

124.    Hillman, alone or through or in combination with its agents and/or intermediaries or customers, infringes at least one claim of the '920 Patent either literally or through the doctrine of equivalents, by manufacturing, using, offering to sell, selling, and/or providing products and/or services that infringe the '920 Patent in the United States, including the "Accused Products" as identified in Exhibits I and J.  Further details of Hillman's infringement are known only to Hillman and will be the subject of discovery.

125.    Among other things, Hillman or persons under its direction and control have used and continue to use the claimed inventions through the testing, operation, service and maintenance of Hillman's Accused Products and services provided to the retail industry for key duplication.  For each claim of the '920 Patent, each and every element recited in that claim contributes to the creation of an accurate duplicate key.  Both Hillman and its retail industry customer benefit from the creation of an accurate duplicate key through the use of the claim's recited elements.  Hillman alone, or indirectly through the instruction, direction, and control of its customer's actions with the PKOR and KeyKrafter machines has used and continues to use the claimed inventions to produce duplicate keys.  Hillman has infringed, is infringing, and will infringe at least claim 1, 4, 5, 6, 7, 9, 10, 11, 14, 15, 17, 18, 19, 20, 22, 23, 24, and 25 of the '920 Patent, either literally or under the doctrine of equivalents, and is in violation of 35 U.S.C. § 271(a).

126.    Alternatively, Hillman's actions of delivering possession of its PKOR and KeyKrafter machines and entering into contractual arrangements with its customers to supply keys for processing in those machines formed a joint enterprise under patent law.  On

information and belief, Hillman owes its customers written or verbal contractual indemnity obligations for any patent related claims related to or arising out of the use of PKOR and KeyKrafter machines.  By operation of the law of joint enterprise, Hillman is jointly and severally liable to Hy-Ko for infringement by operation and use of the PKOR and KeyKrafter at the customer location pursuant to such joint enterprise and is liable in violation of 35 U.S.C. § 271(a).

127.    Hillman has actively induced, is inducing, and will induce the direct infringement of at least one claim of the '920 Patent by its retail customers and by consumers.  On information and belief, Hillman provides instructions to its customers and consumers about how to use the Accused Products and perform each of the steps of the claimed methods.  Hillman provides such instructions during initial installation and through its periodic training of customers' new sales associates.  Hillman provides training videos that instruct users how to use the machine and to perform each step of the claimed methods, such as the type of instruction videos that Hillman has uploaded to YouTube beginning as early as 2013.  Hillman also provides instruction through its user interface touchscreen mounted on the Accused Products.  Hillman's actions that aid and abet others to infringe include through advertising and marketing the Accused Products and providing instruction materials, training, and services regarding the Accused Products.  On information and belief, Hillman took its actions above with knowledge of the '920 Patent and with the intention to cause the infringing acts of its customers and consumers or willful blindness to same and did so cause the infringing acts to occur.  For example, as mentioned above, Hillman received the 2017 memorandum specifically touting the '920 Patent.  On information and belief, Hillman investigated the '920 Patent to evaluate its potential infringement or deliberately ignored the '920 Patent with willful blindness in disregard of the rights of its much smaller rival, Hy-Ko.  Hillman has accordingly induced, is inducing, and will induce infringement of the '920 Patent,

either literally or under the doctrine of equivalents, and is liable in violation of 35 U.S.C. § 271(b).

128.    Hillman has contributed, is contributing, and will contribute to the infringement by its customers of at least one claim of the '920 Patent.  The Accused Products are a material component for use in practicing the Asserted Patents, all of which claim systems, machines and methods for duplicating keys.  The Accused Products are specifically made or adapted for use in an infringement of the Asserted Patents and are not staple articles of commerce suitable for substantial non-infringing use.  For example, Hillman's 2020 Annual Report at page 5 describes the KeyKrafter as Hillman's "most popular, innovative, and effective store associate assisted key duplication kiosk."  Hillman accordingly has contributorily infringed, is infringing, and will infringe the '920 Patent, either literally or under the doctrine of equivalents, and is liable in violation of 35 U.S.C. § 271(c).

129.    As a consequence of each of Hillman's direct and indirect infringement, whether literal and/or under the doctrine of equivalents, of the Asserted Patents, Hy-Ko has been, and continues to be, damaged in an amount not yet determined and is entitled to recover damages pursuant to 35 U.S.C. § 284 and for provisional rights damages under 35 U.S.C. § 154(d).

130.    Upon information and belief, Hillman had actual knowledge of the '920 Patent application on or about the publication date of that application.   Upon information and belief, Hillman had actual knowledge of the '920 Patent on or about the issue date of May 23, 2017.

131.    Upon information and belief, Hillman had knowledge of the '920 Patent and its infringement thereof, by itself and others, before this case was filed.  Despite this awareness, Hillman continued to use, operate, maintain and service the Accused Products in its retail industry customer locations around the country.  Accordingly, infringement of the '920 Patent is willful, and Hy-Ko is entitled to enhanced and other relief.

132.     Upon information and belief, Hillman's infringement of the Asserted Patents will continue in the future, and Hy-Ko will continue to suffer damages as a consequence unless Hillman's infringing acts are enjoined by this Court.

133.     Hy-Ko is entitled to the relief and remedies requested below.

**COUNT IV – INFRINGEMENT OF U.S. PATENT NO. 10,421,133**

134.     Plaintiff re-alleges and incorporates by reference all of the allegations set forth in the paragraphs 1 through 100.

135.     Hillman, alone or through or in combination with its agents and/or intermediaries or customers, infringes at least one claim of the '133 Patent either literally or through the doctrine of equivalents, by manufacturing, using, offering to sell, selling, and/or providing products and/or services that infringe the '133 Patent in the United States, including the "Accused Products" as identified in Exhibits K and L.  Further details of Hillman's infringement are known only to Hillman and will be the subject of discovery.

136.     Among other things, Hillman or persons under its direction and control have used and continue to use the claimed inventions through the testing, operation, service and maintenance of Hillman's Accused Products and services provided to the retail industry for key duplication.  For each claim of the '133 Patent, each and every element recited in that claim contributes to the creation of an accurate duplicate key.  Both Hillman and its retail industry customer benefit from the creation of an accurate duplicate key through the use of the claim's recited elements.  Hillman alone, or indirectly through the instruction, direction, and control of its customer's actions with the PKOR and KeyKrafter machines has used and continues to use the claimed inventions to produce duplicate keys.  Hillman has infringed, is infringing, and will infringe at least claim 1, 2, 3, 4, 5, 6, 9, 10, 11, 12, 13, 14, 15, 16, 18, 20, 21, and 24 of the '133

Patent, either literally or under the doctrine of equivalents, and is in violation of 35 U.S.C. §
271(a).

137.    Alternatively, Hillman's actions of delivering possession of its PKOR and
KeyKrafter machines and entering into contractual arrangements with its customers to supply
keys for processing in those machines formed a joint enterprise under patent law.  On
information and belief, Hillman owes its customers written or verbal contractual indemnity
obligations for any patent related claims related to or arising out of the use of PKOR and
KeyKrafter machines.  By operation of the law of joint enterprise, Hillman is jointly and
severally liable to Hy-Ko for infringement by operation and use of the PKOR and KeyKrafter at
the customer location pursuant to such joint enterprise and is liable in violation of 35 U.S.C. §
271(a).

138.    Hillman has actively induced, is inducing, and will induce the direct infringement
of at least one claim of the '133 Patent by its retail customers and by consumers.  On information
and belief, Hillman provides instructions to its customers and consumers about how to use the
Accused Products and perform each of the steps of the claimed methods.  Hillman provides such
instructions during initial installation and through its periodic training of customers' new sales
associates.  Hillman provides training videos that instruct users how to use the machine and to
perform each step of the claimed methods, such as the type of instruction videos that Hillman has
uploaded to YouTube beginning as early as 2013.  Hillman also provides instruction through its
user interface touchscreen mounted on the Accused Products.  Hillman's actions that aid and
abet others to infringe include through advertising and marketing the Accused Products and
providing instruction materials, training, and services regarding the Accused Products.  On
information and belief, Hillman took its actions above with knowledge of the '133 Patent and
with the intention to cause the infringing acts of its customers and consumers or willful blindness

to same and did so cause the infringing acts to occur.  On information and belief, Hillman investigated the '133 Patent to evaluate its potential infringement or deliberately ignored the '133 Patent with willful blindness in disregard of the rights of its much smaller rival, Hy-Ko. Hillman has accordingly induced, is inducing, and will induce infringement of the '133 Patent, either literally or under the doctrine of equivalents, and is liable in violation of 35 U.S.C. § 271(b).

139.    Hillman has contributed, is contributing, and will contribute to the infringement by its customers of at least one claim of the '133 Patent. The Accused Products are a material component for use in practicing the Asserted Patents, all of which claim systems, machines and methods for duplicating keys.  The Accused Products are specifically made or adapted for use in an infringement of the Asserted Patents and are not staple articles of commerce suitable for substantial non-infringing use.  For example, Hillman's 2020 Annual Report at page 5 describes the KeyKrafter as Hillman's "most popular, innovative, and effective store associate assisted key duplication kiosk."  Hillman accordingly has contributorily infringed, is infringing, and will infringe the '133 Patent, either literally or under the doctrine of equivalents, and is liable in violation of 35 U.S.C. § 271(c).

140.    As a consequence of each of Hillman's direct and indirect infringement, whether literal and/or under the doctrine of equivalents, of the Asserted Patents, Hy-Ko has been, and continues to be, damaged in an amount not yet determined and is entitled to recover damages pursuant to 35 U.S.C. § 284 and for provisional rights damages under 35 U.S.C. § 154(d).

141.    Upon information and belief, Hillman had actual knowledge of the '133 Patent application on or about the publication date of that application.   Upon information and belief, Hillman had actual knowledge of the '133 Patent on or about the issue date of May 23, 2017.

142.     Upon information and belief, Hillman had knowledge of the '133 Patent and its infringement thereof, by itself and others, before this case was filed.  Despite this awareness, Hillman continued to use, operate, maintain and service the Accused Products in its retail industry customer locations around the country.  Accordingly, infringement of the '133 Patent is willful, and Hy-Ko is entitled to enhanced and other relief.

143.     Upon information and belief, Hillman's infringement of the Asserted Patents will continue in the future, and Hy-Ko will continue to suffer damages as a consequence unless Hillman's infringing acts are enjoined by this Court.

144.     Hy-Ko is entitled to the relief and remedies requested below.

### COUNT V – UNFAIR COMPETITION UNDER LANHAM ACT SECTION 43(a)

145.     Plaintiff re-alleges and incorporate by reference all of the allegations set forth in Paragraphs 1 through 100.

146.     Hillman, directly and by its officers, directors, employees and/or agents, has violated Lanham Act § 43(a)(1)(B), 15 U.S.C. § 1125(a)(1)(B), by, on or in connection with goods, using in commerce various false and/or misleading descriptions of fact or false and/or misleading representations of fact in commercial advertising or promotion that misrepresents the nature, characteristics, and quality of Hy-Ko's products sold in interstate commerce.  On information and belief, Hillman's false and/or misleading statements of fact entered interstate commerce, were made to Hy-Ko's customers and potential customers, deceived or had the tendency to deceive a substantial segment of these customers and potential customers, and the deception was material in that the statements likely influenced the consumer's purchasing decisions.  These violations have caused severe and irreparable damage to Hy-Ko for which no remedy at law exists.

147.    Among other Section 43(a) violations, Hillman has made and, on information and belief, continues to make false statements in commercial advertising and promotion about the nature, characteristics and qualities of Hy-Ko's key-cloning technology, including the KID machine and the I-Tool.  More specifically, Hillman disseminated false statements in interstate commerce to customers and potential customers of Hy-Ko, including at least ACE HQ and ACE Dealers, about alleged limitations of Hy-Ko's key cloning technology.  These statements were and are literally false and made in bad faith or misleading and made in reckless disregard to their truth or falsehood.  The statements are and were material for at least the reason that they were likely to influence the purchasing decisions of a substantial portion of Hy-Ko's customer base (and potential customers) and, on information and belief, calculated to and did mislead and deceive ACE HQ personnel and ACE Dealers around the country and cause them to not do business with Hy-Ko.  The statements resulted in actual or probable injury to Hy-Ko, and they were repeated to both the ACE HQ personnel and to the ACE Dealers, included the specific misrepresentations detailed above.

148.    While Hy-Ko managed to retain some of its key duplication business with individual ACE Dealers, the majority were lost due to Hillman's unlawful actions and false statements that continue to this day.  As a direct result of Hillman's false and/or misleading advertising, Hy-Ko lost considerable revenue and profits and, on information and belief, Hillman gained considerable additional revenue and profits. As a direct result of its false advertising, on information and belief, Hillman gained at least $10 million per year in new revenue from ACE.

149.    Hillman's false and/or misleading statements proximately caused economic harm to Hy-Ko by diverting sales from Hy-Ko to Hillman.  Hillman's acts of false and/or misleading advertising also damaged Hy-Ko's business reputation by leading customers and potential customers of Hy-Ko to believe that Hy-Ko's key cloning technology had limited application

and/or was rapidly becoming obsolete and that Hy-Ko was going out business and therefore would not be around to service any of its key duplication equipment provided to or sought to be provided to the customer, thus denying business to Hy-Ko.  On information and belief, Hillman's acts of false and/or misleading advertising were willful and made in bad faith.

150.    For at least the reasons described above, Hillman has engaged in unfair competition under Section 43(a) of the Lanham Act.

151.    On information and belief, Hillman's acts of unfair competition, including false and misleading advertising, will continue unless enjoined by this Court.

152.    Hy-Ko is entitled to the relief and remedies requested below.

### COUNT VI – CONVERSION/RECEIPT OF STOLEN PROPERTY

153.    Plaintiff re-alleges and incorporate by reference all of the allegations set forth in Paragraphs 1 through 100.

154.    Hy-Ko is the rightful owner of all right, title and interest in the detailed engineering drawings for Hy-Ko's KID system now in Hillman's possession, custody and/or control, and Hy-Ko has the right to possession of such drawings and all copies of them.

155.    On information and belief, Hillman obtained the detailed engineering drawings for Hy-Ko's KID system through unlawful means or, at the very least, took possession of the detailed engineering drawings for Hy-Ko's KID system that it knew or should have known were obtained illegally or through improper means.

156.    On information and belief, Hillman has studied the detailed engineering drawings for Hy-Ko's KID system to determine the system's features and functions, affording Hillman valuable competitive information.  By obtaining the detailed engineering drawings for Hy-Ko's KID system, Hillman has gained an unfair advantage in its competition with Hy-Ko for key duplication system customers.

157.    Hy-Ko is a victim of theft of its property.

158.    Hillman is liable to Hy-Ko for conversion of Hy-Ko property or receipt of stolen property.

159.    Plaintiff has been damaged by Hillman's conversion or wrongful receipt of Hy-Ko property.

160.    Hy-Ko is entitled to the relief and remedies requested below.

## COUNT VII - REPLEVIN

161.    Plaintiff re-alleges and incorporate by reference all of the allegations set forth in paragraphs 1 through 100.

162.    In addition to damages caused by Hillman's conversion and/or receipt of misappropriated detailed engineering drawings for Hy-Ko's KID system, Hy-Ko is entitled to recover possession of the detailed engineering drawings for Hy-Ko's KID system and any copies of such drawings.

163.    Hy-Ko is entitled to the relief and remedies requested below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays judgment in its favor and against Hillman that:

a.      Hillman has engaged in false and/or misleading advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);

b.      Hillman, its officers, directors, agents, servants, employees, attorneys, affiliates, divisions, branches, parents, and those persons in active concert or participation with any of them, be permanently restrained and enjoined from false and misleading advertising under 15 U.S.C. § 1116(a);

c.      Hillman must conduct remedial advertising to the ACE community and other customers, potential customers, and channels to which Hillman directed its product

disparagement campaign in a manner sufficient to remedy Hillman's past acts of false and/or misleading advertising;

     d.      Awards damages under 15 U.S.C. § 1117 including (1) Hillman's profits, (2) damages sustained by Hy-Ko enhanced by three times for willfulness, and (3) the costs of this action;

     e.      Hillman has directly and/or indirectly infringed the Asserted Patents, either literally or under the doctrine of equivalents;

     f.      Hillman, its officers, directors, agents, servants, employees, attorneys, affiliates, divisions, branches, parents, and those persons in active concert or participation with any of them, be permanently restrained and enjoined from directly and indirectly infringing the Asserted Patents;

     g.      Awards damages under 35 U.S.C. § 284 and 35 U.S.C. § 154(d) sufficient to compensate Hy-Ko for Hillman's past infringement of the Asserted Patents, enhanced by three times for Hillman's willful infringement;

     h.      Requires an accounting of all of Hillman's infringing sales and damages including, but not limited to, those sales and damages not presented at trial;

     i.      Hy-Ko be awarded its pre-judgment and post-judgment interest and costs against, in accordance with 35 U.S.C. § 284 and 35 U.S.C. § 154;

     j.      The case is exceptional and that Hillman be directed to pay Hy-Ko's reasonable attorneys' fees incurred in connection with this action pursuant to 15 U.S.C. § 1117(a) and 35 U.S.C. § 285;

     k.      Hillman converted Hy-Ko's property or that Hillman unlawfully received stolen detailed engineering drawings for Hy-Ko's KID system;

l.      Requires that Hillman return all copies of the misappropriated detailed engineering drawings for Hy-Ko's KID system to Hy-Ko;

m.      Awards Hy-Ko damages caused by Hillman's conversion or unlawful receipt of stolen property;

n.      Awards an assessment and award of costs and attorneys' fees for conversion or unlawful receipt of stolen property;

o.      Awards Hy-Ko such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY

Plaintiff demands a trial by jury of any and all claims and issues so triable.

Date:   August 2, 2021                    Respectfully submitted,


By: */s/ Steven M. Auvil*
    Elizabeth L. DeRieux
    State Bar No. 05770585
    CAPSHAW DERIEUX, LLP
    114 E. Commerce
    Gladewater, TX 75647
    Telephone: (903) 845-5770
    Email: ederieux@capshawlaw.com

    Steven M. Auvil
    Ohio Bar No. 0063827
    Bryan J. Jaketic
    Ohio Bar No 78429
    SQUIRE PATTON BOGGS (US) LLP
    4900 Key Tower, 127 Public Square
    Cleveland, Ohio 44114
    Telephone: (216) 479-8500
    Fax: (216) 479-8780
    Email: steven.auvil@squirepb.com
    Email: bryan.jaketic@squirepb.com

David S. Elkins
Cal. Bar No. 148077 (admitted *pro hac vice*)
SQUIRE PATTON BOGGS (US) LLP
1801 Page Mill Road, Suite 110
Palo Alto, California 94304
Telephone: (650) 843-3378
Fax: (650) 843-9777
Email: David.Elkins@squirepb.com

Timothy J. O'Hearn
Ohio Bar No. 0025225 (admitted *pro hac vice*)
2555 Coventry Rd.
Shaker Heights, Ohio 44120
Telephone: (216) 272-3152
Email: timothyjohearn@gmail.com

Amanda Dodds Price
State Bar No. 24060935
SQUIRE PATTON BOGGS (US) LLP
6200 Chase Tower
600 Travis Street
Houston, TX 77002
Telephone: (713) 546-5850
Fax: (713) 546-5830
Email: amanda.price@squirepb.com

***ATTORNEYS FOR PLAINTIFF***
***HY-KO PRODUCTS COMPANY LLC.***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was filed on **August 2, 2021** using the Court's CM/ECF System. Service will be made upon the parties through the CM/ECF System.

*/s/ Steven M. Auvil*
Steven M. Auvil
